UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL JOHNSON,

        Plaintiff,               Case No. 2:14-cv-11375
                               District Judge Sean F. Cox
v.                             Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____/

**RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 14) AND TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 12)**

**I.    RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.    REPORT**

      Plaintiff, Carl Johnson, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for social security disability insurance

benefits and supplemental security income.  This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's motion for

summary judgment (DE 12), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 14), Plaintiff's reply (DE 15), and the administrative record (DE 9).

### A.   Background

Plaintiff protectively filed his application for benefits on October 8, 2010, alleging that he has been disabled since August 2, 2010, at age 47.  (R. at 198.) Plaintiff alleges disability as a result of right wrist and elbow injury following a car accident.  (R. at 197.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Gregory Holiday held a hearing on July 5, 2012 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.[1]  (R. at 20-63.)   On February 3, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Holiday's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.   Plaintiff's Medical History

On August 2, 2010, the truck Plaintiff was riding in was rear-ended.  (R. at 387.)  He was treated by Christopher Chang, M.D., from August 13, 2010 through

---

[1] Plaintiff's hearing was initially scheduled for February 21, 2012.  However, the ALJ granted Plaintiff an extension because his previous attorney withdrew and he had only recently retained his current attorney.  (R. at 64-69.)

May 13, 2011.  On his first visit with Dr. Chang, Plaintiff noted that he was taking Motrin as needed for his pain.  The same day, Dr. Chang's notes indicate that Plaintiff had blurred vision, diplopia, and blindness and that his musculoskeletal system was stiff, painful, weak, and numb.  (Id.)  He diagnosed Plaintiff with a right upper trapezoid strain and right wrist strain.  (R. at 388.)  In October 2010, Dr. Chang performed an EMG and nerve conduction study of Plaintiff's right upper extremity, neck, and back, both of which showed normal results.  (R. at 385-86.)  Dr. Chang prescribed Motrin and Vicodin for Plaintiff's pain.  (R. at 389 and 391.)  Dr. Chang opined that Plaintiff was disabled from employment, household duties, and driving from August 2, 2010 through November 6, 2010, and March 2, 2011 through June 13, 2011.  (R. at 305-308.)

Plaintiff was treated by Christian V. Orano, D.C., from October 25, 2010 through May 20, 2011.  According to Dr. Orano's notes, Plaintiff's reports of his pain and discomfort alternated between severe and moderate.  Dr. Orano maintained throughout the treatment that Plaintiff had a good prognosis.  (R. at 229, 231, 242, 245, 320.)  In addition, he noted that the likelihood of "nearly complete symptomatic relief is excellent."  (R. at 316.)  Dr. Orano's January 14, 2011 notes indicate that Plaintiff had a normal finger-to-nose test and a normal heel and toe walking test.  (R. at 316.)

3

On May 20, 2011, Plaintiff underwent an MRI of his cervical spine and lumbar spine. (R. at 309-313.) The MRI of his cervical spine indicated mild reversal of the cervical lordosis, mild degeneration of the anterior atlantoaxial articulation; mild posterior annular disc bulging and mild bilateral facet arthropathy at C2-3; minimal posterior annular disc bulging at C3-4, small posterior midline disc herniation and mild to moderate bilateral facet arthropathy at C4-5; mild bilateral facet arthropathy at C5-6; minimal posterior annular disc bulging at C6-7; and minimal posterior annular disc bulging and mild facet arthropathy at C7-T1. The overall impression was mild reversal of the cervical lordosis. The MRI of his lumbar spine revealed mild reversal of the lumbar lordosis; minimal right facet arthropathy at L1-2; minimal facet hypertrophy at L2-3, mild loss of disc hydration at L3-4; mild loss of peripheral disc hydration, mild endplate spondylosis, mild posterior annular disc bulging, and mild bilateral facet arthropathy at L4-5; mild loss of disc hydration, mild endplate spondylosis, posterior annular disc bulging, and mild annular tearing at L5-S1. (R. at 312-313.)

Plaintiff was seen by consultative examiner Abigail Neal, M.D., on April 15, 2011. (R. at 219-223.) Dr. Neal notes that, according to Plaintiff, his wrist pain increases with picking things up, turning keys, writing, bending, and any pressure or twisting. (R. at 219.) Plaintiff reported that his right shoulder pain increases with reaching, getting dressed, any overhead activities, and picking things up off

the floor.  He also indicated that using ice packs helps temporarily. (Id.)  Upon

physical examination, Dr. Neal concluded that his vision with corrective lenses

was 20/30 in the left eye, 20/100 in the right eye, and "both 20/30 with corrective

lenses."  (R. at 220.)   She found that Plaintiff was able to perform finger-to-nose

with both hands, that his strength was 5/5 in the left upper extremity and 4/5 in the

right upper extremity, with a decreased grip and pincer grasp on the right side.

(Id.) Dr. Neal's physical examination revealed that Plaintiff was able to pick up a

coin with both hands but could not write with his right hand because of the pain.

She found his gait was normal, he was able to walk on his heels and tiptoes, do

tandem gait, and squat normally.  (Id.)  In her assessment, Dr. Neal indicated that

Plaintiff has decreased strength in the right upper extremity, but no significant

muscle wasting.  (R. at 221.)

On May 4, 2011, State Agency Reviewing Physician Charles Edmonds,

M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.

(R. at 70-74.)  Dr. Edmonds opined that Plaintiff's right wrist and elbow

impairments were not severe.  (R. at 74.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the July 5, 2012 administrative hearing, Plaintiff testified that he became

disabled following a motor vehicle accident in 2010.  (R. at 37.)  He describes the

pain in his right arm, wrist, and elbow as "constant." (R. at 47.) Plaintiff averred that he is able to lift things with his left arm, but cannot use his right arm to help. (R. at 51.) He is, however, able to lift his right hand to his face with some pain and difficulty. (R. at 53.) Plaintiff testified that his pain level is usually a ten out of ten and that he cannot sleep at night because of the pain. (R. at 48 and 54.) Plaintiff expressed frustration about his pain and inability to take care of his responsibilities. (R. at 49-50.)

In addition to the pain in his right arm, Plaintiff testified that he has trouble seeing. He averred that he no longer has a driver's license because he cannot pass the eye test without his glasses, which were broken at the time of the hearing. (R. at 42-43.) According to Plaintiff, the glasses only slightly improve his vision. (R. at 43.) Plaintiff testified that he lives near a bus stop and takes the bus when necessary for transportation. (R. at 45-46.)

Plaintiff indicated that he no longer receives physical therapy or chiropractic care because he does not have insurance. (R. at 39 and 54.) He testified that, when he is unable to get his Vicodin, he takes marijuana for pain relief. (R. at 43-44.) Plaintiff emphasizes, however, that he does not drink, smoke, or do drugs recreationally, and only began using marijuana to help with the pain. (R. at 50.) Plaintiff has several additional at-home remedies to help with his pain. For example, he testified that adjusting his position to lean forward with his head down

6

makes him more comfortable.  (R. at 55.)  He also wears a support on his right

wrist a few hours per day in order to relieve the pressure in his wrist.  (R. at 44.)

Plaintiff was previously employed as a contractor, but has been unable to do

that work since his accident.  (R. at 38.)  He testified that he lives alone in his

house and his three adult children (ages 27, 20, and 18) come over to visit.  (R. at

40.)  His mother cooks his meals "most of the time" and sends a plate to his house

with his daughter.  (R. at 41.)  Plaintiff testified that he takes care of his own

grooming "with some little difficulties," and does light loads of laundry in his

basement washer and dryer, although his children also take his clothes to the

laundromat.  (R. at 40 and 42.)   Plaintiff testified that he has a computer in his

home, but does not use it because of his visual difficulties and because he does not

have the internet.  (R. at 47.)

### 2.    Vocational Expert Testimony

John Stokes testified as the Vocational Expert ("VE") at the July 5, 2012

administrative hearing.  (R. at 56-62.)  The ALJ presented a series of hypotheticals

to the VE.  In the first hypothetical, the ALJ asked the VE to determine if there was

any work in the regional or national economy that a hypothetical person of

Plaintiff's age, educational background, and work experience could perform at the

light exertional level with the following limitations:

> No pushing or pulling with the right upper extremity and no more than
> occasional climbing ladders; no climbing of any ropes or scaffolds; no
> crawling.
>
> No constant rotation, flexion or extension of the neck.  Only partially
> extended reaching with the right upper extremity on an occasional
> basis.   No overhead reaching and handling with the right upper
> extremity.  No more than occasional gross manipulation.  No more
> than frequent fine manipulation.

(R. at 57.)   The VE asked for additional clarification on the restriction related to

occasional partial reaching, and the ALJ noted that the hypothetical individual

would be limited to no fully extended reaching.  (Id.)  The ALJ also clarified that

the occasional gross manipulation was limited to the right upper extremity.  (R. at

58.)  Based on this hypothetical, the VE acknowledged that Plaintiff could not

perform his past relevant work.  (R. at 58.)  The VE testified, however, that the

hypothetical individual could perform the position of protective service worker,

such as an "observe and report" security guard, Dictionary of Occupational Title

("DOT") number 372.667-030, with 12,000 jobs in Michigan and 600,000

nationally.  (R. at 59.)

In the second hypothetical, the ALJ asked the VE to determine if there was

any additional work in the regional or national economy that the individual in the

first hypothetical could perform with the following modifications:

> First, no climbing of any ladders, ropers or scaffolds; no more than
> frequent stooping; no more than occasional fine manipulation with the
> right upper extremity—yes, fine manipulation with the right upper
> extremity, no more than occasional.

8

(R. at 60.)  The Social Security Regulations define "frequent" as "occurring from one-third to two-thirds of the time."  S.S.R. 83-10, 1983 WL 31251, at *6.  Based on the second hypothetical, the VE acknowledged that there were no changes in the jobs the hypothetical person could perform.

In the third hypothetical, the ALJ asked the VE to determine if there was any work in the regional or national economy that the individual in the second hypothetical could perform, "but instead of occasional gross manipulation with the right upper extremity, this person can perform no more than brief gross manipulation with the right upper extremity."  (R. at 60-61.)  The ALJ clarified that "brief" is defined as no more than ten percent of the work day.  The VE averred that such a restriction would not change the jobs the hypothetical individual could perform.  (Id.)

In the fourth and final hypothetical, the ALJ asked the VE to, "Add to hypothetical number three the limitation on vision where this person can only occasionally perform near acuity or far acuity."  (R. at 61.)  The VE testified that such a limitation would "preclude this hypothetical individual's ability to perform the job previously cited [*i.e.*, security guard], as near and far acuity are required on a frequent basis for this occupation."  (R. at 61-62.)

9

## D.  THE ADMINISTRATIVE DECISION

On September 26, 2012, the ALJ issued his decision.  (R. at 20-28.)  At step

one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not

engaged in substantially gainful activity since October 8, 2010.  (R. at 20.)  At step

two, the ALJ found that Plaintiff had the following severe impairments: right wrist

disorder, right arm disorder, right shoulder disorder, and  neck disorder, "all status

post motor vehicle accident," as well as back pain.  (R. at 22.)  The ALJ further

concluded that Plaintiff's alleged vision disorder was not a severe impairment.  (R.

at 22-23.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the  review, *see Colvin v.
Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet
    or equal the criteria of an impairment set forth in the Commissioner's
    Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the
    claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and
    residual functional capacity, can the claimant perform other work
    available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23.) At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff can perform light work:

> [E]xcept that the claimant can never push or pull with the right upper extremity; climb ladders, ropes or scaffolds; or crawl.  The claimant can only frequently stoop.  The claimant is limited to no constant rotation, flexion or extension of the neck; no fully-extended reaching with the right upper extremity; only occasional partially-extended reaching with the right upper extremity; no overhead reaching and handling with the right upper extremity; only brief (up to 10% of the workday) gross manipulation with the right upper extremity; and only occasional fine manipulation with the right upper extremity.

(R. at 23.)   In reaching this determination, the ALJ assigned limited weight to the opinions of Dr. Christopher Chang, noting that his opinions were based on Plaintiff's subjective complaints, were "overly sympathetic," and were inconsistent with the objective medical evidence.  (R. at 24-25.)  He also assigned limited weight to the State Agency Consultant's opinion that Plaintiff's right wrist and elbow impairments were not severe.  (R. at 25.)  The  ALJ also considered the

---

[3] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

medical evidence from Back In Line Chiropractic, consultative examiner Dr. Abigail Neal, and Plaintiff's May 20, 2011 MRI.  (R. at 25-26.)

Relying on the VE's testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work as material handler and sterilizer, but concluded that he was capable of performing one other job that exists in significant numbers in the state and national economy.  (R. at 27-28.)   He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 25.)

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case *de novo*, resolve conflicts in evidence or decide

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court,

to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial.

The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that

would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.  ANALYSIS

In his motion for summary judgment, Plaintiff asserts two main statements of error.  First, he contends that the ALJ erred in his articulation that Plaintiff's medical impairments failed to meet the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically listings 1.02B and 1.04. Second, he argues that the ALJ erred in his RFC assessment in a number of ways, including improperly discounting Plaintiff's credibility, his failure to give sufficient weight to his treating physician's opinions, and failing to ensure that there was no conflict between the VE testimony and the DOT.[2]   The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions. The Undersigned agrees with the Commissioner's assertion and will address each argument in turn.

### 1.    Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Does Not Have a Listing Level Impairment

In this case, the ALJ found that Plaintiff has severe impairments of: right wrist disorder, right arm disorder, right shoulder disorder, neck disorder, and low back pain.  (R. at 22.)  He then went on to step three to conclude that Plaintiff

---

[2] In his reply brief, Plaintiff indicates that he is not arguing that the ALJ "improperly assessed Plaintiff's credibility and gave too little weight to the opinion of Dr. Chang" and instead is arguing that the ALJ's opinion was inconsistent with the testimony given at the hearing.  (DE 15 at 4.)  As addressed more fully below, such an argument necessitates an analysis of the ALJ's credibility finding.

"does not have an impairment or combination of impairments that meets or medically equals the severity" of any of the listed impairments.  (R. at 23.)

The ALJ first considered Listing 1.02B, noting that Plaintiff does not meet the listing because he is able to "perform fine and gross movements effectively[,] as defined in the regulations."  (Id.)  He next considered Listing 1.04, concluding that Plaintiff "lacks the requisite motor and sensory defects and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication."  (Id.)  Plaintiff now argues that the ALJ's conclusion that he did not meet the criteria for Listings 1.02B and 1.04 constitutes legal error warranting an immediate award of benefits.

Plaintiff bears the burden of proving that his impairments meet or medically equal a particular listing.  *See Buress v. Sec'y of Health & Hum. Serv's*, 835 F.2d 139, 140 (6th Cir. 1987).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).  "A claimant must satisfy all of the criteria to meet the listing." *Rabbers*, 582 F.3d at 653.  Moreover, all of the criteria must be met concurrently for a period of twelve continuous months.  *See* 20 C.F.R. §404.1525(c)(3), (4); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00D ("[b]ecause

abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation").

Plaintiff asserts that the instant case is analogous to *Barbera v. Comm'r of Soc. Sec.*, No. 11-cv-13265 (E.D. Mich. June 5, 2012) *report and recommendation adopted* on June 25, 2012.  There, the Magistrate Judge remanded because the ALJ provided a boilerplate notation that the claimant did not have a condition that met or medically equaled Listings 1.00, 12.00, and 14.00, and did not provide any analysis of the elements of Listing 1.04, leaving "the Court to speculate as to which of the several elements of Listing 1.04A the ALJ believed were not met." *Barbera*, No. 14-11375 at 9-10.   Specifically, the ALJ's sole discussion of Listing 1.04 was as follows:  "[a]lthough the claimant has the severe impairments listed above, the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal Systems. . . ." *Id.* at 10.  In addition, the ALJ in *Barbera* elsewhere recognized the claimant's "mild spinal cord compression . . . and electrodiagnostic evidence of C6-C7 radiculopathy." *Id.* The Undersigned concludes that the instant case is distinguishable from *Barbera* for several reasons, which will be addressed below.

### a.    Listing 1.02B

To meet Listing 1.02B, Plaintiff must demonstrate the following:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or

16

fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

\*      \*      \*

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.02B.  Here, the ALJ specified that

Plaintiff did not meet Listing 1.02B because he was "able to perform fine and gross

movements as defined in the regulations."[3]  (R. at 23.)

"An ALJ need not discuss every piece of evidence in the record for his [or

her] decision to stand."  *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 6661, 665

(6th Cir. 2004).  However, "[a]n ALJ must evaluate the relevant evidence before

---

[3] The Regulations provide the following description of fine and gross movements:

Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(b)(2)(C).

17

concluding that a claimant's impairments do not meet or equal a listed impairment.

A boilerplate finding is insufficient to support a conclusion that a claimant's

impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503, 512 (6th Cir. 2001).

Instead, the ruling must "clearly articulate the rationale underlying the decision" in

order to facilitate meaningful judicial review. *Bailey v. Comm'r of Soc. Sec.*, 173

F.3d 428, at *3 (6th Cir. 1999). When considering whether an impairment meets

or medically equals a Listing, the ALJ "does not err by not spelling out every

consideration that went into the step three determination" and need only "review

all evidence of impairments to see if the sum of impairments is medically

equivalent to a 'listed impairment.'" *Bledsoe v. Barnhart*, 165 F. App'x 408, 411

(6th Cir. 2006).

As a preliminary matter, the ALJ in the instant case has provided

substantially more than that in *Barbera* in his step three analysis. Furthermore, he

fully articulated his reasoning in portions of his opinion that did not directly

address step three. *See Bledsoe*, 165 F. App'x at 411 (considering the ALJ's entire

opinion to determine whether he sufficiently articulated his reasons under step

three); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *26

(E.D. Mich. Jan 13, 2015) ("The ALJ does not need to use a particular format, and

reviewing courts will read the decision 'as a whole . . . to ensure there is sufficient

development of the record and explanation . . . .'" (quoting *Jones v. Barnhart*, 364

18

F. 3d 501, 505 (3d Cir. 2004)).  Here, the ALJ considered Plaintiff's reported

activities of daily living, including doing his own laundry and attending to his

personal needs.  (R. at 24.)  The ALJ notes that Plaintiff has "no problems with his

left arm."  (Id.)  Additionally, the ALJ addresses Plaintiff's strength of 5/5 in the

left upper extremity and 4/5 in the right upper extremity.  (R. at 25.)  Moreover, he

noted that Plaintiff was "able to perform fine and gross movement as defined in the

regulations."  (R. at 23.)  Accordingly, the ALJ sufficiently articulated his rationale

as to why Plaintiff does not have a condition that meets or medically equals Listing

1.02B.

### b.    Listing 1.04

To meet Listing 1.04, Plaintiff must demonstrate the following:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal
arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease,
facet arthritis, vertebral fracture), resulting in compromise of a nerve
root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-
> anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising test
> (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate medically
> acceptable imaging, manifested by severe burning or painful
> dysesthesia, resulting in the need for changes in position or
> posture more than once every 2 hours;
> or

19

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04.  In his opinion, the ALJ concluded that Plaintiff's impairments did not meet this listing because Plaintiff "lacks the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication."  (R. at 23.)  In addition, the ALJ cites to Plaintiff's October 2010 EMG and nerve conduction study, in which his right upper extremity, neck, and back were normal.  He also points to Plaintiff's May 20, 2011 MRI, which revealed only mild reversal of the lumbar lordosis and no abnormal lumbar spine curvature, mild posterior annular disc bulging, and other issues determined to be "mild."  (R. at 26.)  Substantial evidence in the record supports the ALJ's conclusion.

Plaintiff contends that his May 20, 2011 MRI shows that he suffered "numerous disc bulges and herniations, some with foraminal stenosis and possible impingement on the S1 nerve roots."  (DE 15 at 3.)  Even if the record demonstrated this, however, it is insufficient to show that his condition meets or medically equals Listing 1.04.  Plaintiff does not point to evidence in the record that demonstrates sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.  Plaintiff's argument is accordingly

20

unavailing. The ALJ properly articulated his reasons for concluding that Plaintiff's impairments do not meet or medically equal Listings 1.02B and 1.04 and substantial evidence supports his conclusions.

### 2.    Substantial Evidence Supports the ALJ's Conclusions with Regard to Plaintiff's RFC

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments."   *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§ 404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material

inconsistencies or ambiguities in the evidence in the case record
were considered and resolved.

S.S.R. 96-8, 1996 WL 374184, at *6-7.

Plaintiff asserts that the ALJ erred in his RFC articulation because "the
opinion and order of the ALJ were inconsistent with the testimony given at the
hearing," including Plaintiff's personal grooming, laundry, vision, and sleeping
habits.  (DE 15 at 4.)  Plaintiff also asserts that, in assessing Plaintiff's RFC, the
ALJ failed to give proper weight to the opinion of treating physician Dr.
Christopher Chang.  (DE 12 at 12.)  In addition, Plaintiff maintains that, because
the ALJ did not take into account the totality of Plaintiff's impairments in his RFC
assessment, the RFC does not reflect his ability to perform substantial gainful
activity.  Plaintiff posits that the closest hypothetical to Plaintiff's RFC was the last
one, in which the hypothetical individual can only occasionally perform near
acuity and far acuity.  (DE 15 at 5.)  I will address each of these arguments in turn.

### a.   Assessment of Plaintiff's Credibility

Although Plaintiff contends that he does *not* challenge the ALJ's credibility
assessment, his assertion that the ALJ's opinion and order was inconsistent with
Plaintiff's testimony at the hearing and that he failed to give it sufficient weight
necessarily involves a credibility determination.  Specifically, the ALJ indicates
that he discounted some of Plaintiff's testimony because he found him less than
fully credible.  (R. at 25.)  To support his credibility assessment, the ALJ notes that

22

"the objective evidence in the record weighs heavily against the claimant's allegations in this case." (Id.) He goes on to point out that, while Plaintiff testified that he is in constant pain and virtually has "no" strength in his right arm, shoulder, and wrist, he gave conflicting information in his function report, where he indicated that he is able to attend to his personal care needs, do light house and yard work, and prepare his own meals, and in his later testimony, where he averred that he does some of his own laundry. (R. at 25-26, 41-42, 190-197.) Finally, the ALJ makes note of inconsistencies in the record by pointing to Plaintiff's 4/5 strength on his right side, his ability to perform a finger to nose function and pick up a coin with both hands, and his ability "to perform fine and gross movements as defined in the regulations." (R. at 26, 23.)

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531. Here, as described above, substantial evidence supports the ALJ's credibility assessment. The ALJ pointed out

23

contradictions among the medical reports and Plaintiff's testimony that he had no strength on his right side. Accordingly, to the extent that Plaintiff implicitly challenges the credibility finding, such a challenge is unavailing.

### b.    Weight of Opinion Evidence

Plaintiff asserts that the ALJ erred in his RFC assessment in part by discounting the opinion of his treating physician, Dr. Christopher Chang. Additionally, Plaintiff contends that the ALJ improperly minimized the consultative examiner's findings that Plaintiff was unable to fill out paperwork because he could not write with his right hand.

### 1.    Treating Physician Dr. Chang

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants. Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements, specifically:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 404.1527). Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted).  The United

States Court of Appeals for the Sixth Circuit has stressed the importance of the

good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly

important when the treating physician has diagnosed the claimant as disabled."

*Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008)

(citing *Rogers*, 486 F.3d at 242).

The ALJ provided good reasons for discounting the treating physician

opinion and substantial evidence supports this conclusion.  Plaintiff contends that

the ALJ failed to give substantial deference to the treating source evidence.

Specifically, Plaintiff notes that Dr. Chang "disabled" Plaintiff from August 2,

2010 through June 13, 2011.  (DE 12 at 12.)  Such a determination is reserved to

the Commissioner and therefore not entitled to special significance.  20 C.F.R. §

404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).  In addition,

the ALJ describes the length of the treatment relationship ("from August 12, 2010,

through May 13, 2011" (R. at 24)) and the nature of the treatment relationship

("the claimant received treatment . . . for his right wrist, right arm, right shoulder,

and neck. . . ." (Id.)).  Furthermore, the ALJ indicates that he assigned less weight

to Dr. Chang's opinion because it was based on Plaintiff's subjective complaints of

pain, which the ALJ had already determined to be less than credible.  (R. at 24-25.)

For example, although the only objective evidence on record at the time showed a

normal EMG result, Dr. Chang still noted that Plaintiff was disabled.  Finally, the

ALJ noted that Dr. Chang's opinion was not supported by the objective medical

evidence in the record as a whole.  The ALJ appropriately applied the *Wilson*

factors to his assignment of limited weight to Dr. Chang's opinion.

### 2.      Consultative Examiner Dr. Neal

Plaintiff asserts that the ALJ improperly minimized the opinion of

consultative examiner Dr. Abigail Neal, who indicated that Plaintiff was unable to

write with his right hand.  As a consultative examiner who saw Plaintiff only once,

the treating source rule does not apply to Dr. Neal's opinion.  *See Kornecky v.

Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of

decisions unanimously hold that a single visit does not constitute an ongoing

treatment relationship. . . . .").  Instead, the ALJ must only "consider" the findings

of a consultative examiner.  404.1527(e)(2)(i).  Here, the ALJ considered Dr.

Neal's own findings that Plaintiff had a 4/5 strength in his upper right extremity.

27

(R. at 25.) He also considered her findings that Plaintiff could not write with his right hand, but could perform finger-to-nose and pick up a coin with both hands. (Id.) Dr. Neal's opinion was not entitled to special significance, and the ALJ appropriately considered her findings.

To the extent Plaintiff asserts that Dr. Neal's opinion was consistent with Dr. Chang's opinion that Plaintiff was disabled, that argument is unavailing. As addressed above, the ALJ provided good reasons for discounting the treating physician's opinion, including the fact that it was inconsistent with substantial evidence in the record. There is no requirement that the ALJ can only discount a treating physician's opinion if it is inconsistent with *all* the evidence in the record. *See* 20 C.F.R. § 404.1527(c); rather, the weight of a treating physician's opinion relates to its consistency "with the record as a whole." 20 C.F.R. § 404.1527(c)(4). Furthermore, Dr. Chang's opinion that Plaintiff was disabled is an issue reserved to the Commissioner, which is also not entitled to any special significance.

### c.   Substantial Evidence Supports the ALJ's Treatment of Plaintiff's Visual Impairment

In addition, Plaintiff asserts that, because the ALJ did not take into account the totality of Plaintiff's impairments in his RFC assessment, namely, his visual impairment, the RFC does not reflect his ability to perform substantial gainful activity. Substantial evidence, however, supports the ALJ's RFC conclusions.

Plaintiff indicates that the ALJ's final hypothetical, in which the hypothetical individual was limited to only occasionally performing near acuity or far acuity, is the closest to his actual RFC.  (R. at 61.)  Plaintiff correctly indicates that, according to the VE, such a limitation would be work preclusive.  However, the ALJ concluded that Plaintiff's vision disorder was not a severe impairment and substantial evidence in the record supports such a finding.  (R. at 22.)  The ALJ describes Plaintiff's testimony that he cannot see to pass his driver's test, to watch television, or to use his computer.  He also notes Dr. Chang's August 13, 2010 assessment that Plaintiff has "blurred vision, diplopia, blind."  (R. at 387.)  However, this information is listed under "symptoms," indicating that it comes solely from Plaintiff's subjective complaints.  Under "objective tests," there is no indication of an eye exam having been performed, and there are no visual acuity readings listed.  (R. at 389.)  Moreover, his diagnoses make no reference to Plaintiff's vision.  (R. at 389, 391, and 393.)

To support his determination that Plaintiff's visual impairment is not severe, the ALJ relies on consultative examiner Dr. Neal's objective medical findings that Plaintiff's vision with corrective lenses was 20/30 in his left eye, 20/100 in his right eye, and 20/30 in both eyes.  (R. at 22-34 and 220.)  Such a result does not render Plaintiff blind under the regulations.  *See Williams v. Comm'r of Soc. Sec.*, 93 F. App'x 34, 36 (6th Cir. 2004) ("To be entitled to benefits for blindness, [the

plaintiff] must have central visual acuity of 20/200 or less in the better eye, with

the use of a corrected lens."); 42 U.S.C. § 416(i)(1)(B); 20 C.F.R. § 404.1581.

There is no other objective medical evidence in the record related to Plaintiff's

visual acuity. *See McCoy ex rel. McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir, 1995)

(observing that the regulations require a claimant's subjective claims to be

"supported by objective medical evidence in order to serve as the basis of a finding

of disability") (citing 20 C.F.R. § 404.1529; 42 U.S.C. § 423(d)(5)(A)).

Accordingly, substantial evidence supports the ALJ's RFC related to Plaintiff's

visual acuity.

### d.    The ALJ's Failure to Ask the VE Whether a Conflict Existed Amounted to Harmless Error

Plaintiff also argues that the ALJ committed reversible error by failing to ask

the VE whether there was a conflict between her testimony and the DOT.  As

support for this proposition, Plaintiff cites to *Teverbaugh v. Comm'r of Soc. Sec.*,

358 F. Supp. 2d 702, 704 (E.D. Mich. 2003).  In *Teverbaugh*, the Court remanded

because ALJ failed to ask whether there was a conflict between her testimony and

the DOT and the VE did not provide job codes, so there was no other way for the

parties to determine if there was such a conflict.

Pursuant to Social Security Regulation 00-4p, the ALJ has an affirmative

responsibility to ask about any possible conflict between the VE testimony and

information provided in the DOT.  S.S.R. 00-4p.  "Courts are divided as to whether

the failure to inquire into DOT inconsistencies entitles a Plaintiff to relief."
*Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 574 (6th Cir. 2007).
However, "there is considerable support for the application of harmless error
where the ALJ fails to make the required inquiry regarding the DOT." *Frederick
v. Comm'r of Soc. Sec.*, No. 10-11349, 2011 WL 1518966, at *7 (E.D. Mich. Mar.
25, 2011) (citing *Brown v. Barnhart*, 408 F.Supp.2d 28, 35 (D.D.C. 2006);
*Hodgson v. Barnhart*, 2004 WL 1529264, at *2 (D.Me. 2004); *Jackson v.
Barnhart*, 120 F. App'x 904, 906 (3d Cir. 2005); *Tisoit v. Barnhart*, 127 F. App'x
572, 575 n.1 (3rd Cir. 2005)); *but see Teverbaugh*, 258 F.Supp.2d at 706 ("Because
the VE's testimony was the only step five evidence that the ALJ relied upon, the
Court cannot rule that there is substantial evidence to support the ALJ's
findings.").  "However, in each instance [in which the reviewing court remanded],
the ALJ's failure to make the 00–4p inquiry was coupled with an identifiable
inconsistency between the VE's testimony and the DOT." *Frederick*, 2011 WL
1518966 at *7.

Here, the ALJ's failure to make the required inquiry amounts to harmless
error.  Plaintiff has failed to identify any inconsistency between the DOT and the
hypothetical limitations. In contrast to the *Teverbaugh* case, here the VE provided
the gate guard job code as DOT number 372.667-030.  Plaintiff provides the DOT
definition and asserts that "the definition of this job requires duties that far

31

outweigh even the RFC," including "frequent fine and gross manipulation, mowing

lawns, sweeping gate areas, and frequent writing and fingering." (DE 15 at 5.)

However, the job code provided is not inconsistent with Plaintiff's RFC.

> The DOT definition for gate guard is as follows:
>
> Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and from buildings and grounds: Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone. Issues passes at own discretion or on instructions from superiors. Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products. May record number of trucks or other carriers entering and leaving. May perform maintenance duties, such as mowing lawns and sweeping gate areas. May require permits from employees for tools or materials taken from premises. May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022]. May answer telephone and transfer calls when switchboard is closed. When stationed at entrance to restricted area, such as explosives shed or research laboratory, may be designated Controlled-Area Checker (any industry).

(DE 15 at 5.) The DOT describes the strength requirement for the position as

"light," which is consistent with the ALJ's RFC. *See* DOT Gate Guard, No.

372.667-30, 1991 WL 673099. Plaintiff does not indicate which parts of the above

definition involve "frequent fine and gross manipulation," and the Undersigned

does not see such a requirement in the definition. Nor does the fact that the guard

"may" record the number of trucks or other carriers entering or leaving show that

there will be "frequent writing and fingering" required. (Id.) In fact, the DOT

listing indicates that "fingering" is not an activity or condition involved in the job

description.  *Id.*  Similarly, the VE's testimony is not inconsistent with the ALJ's

restrictions related to reaching, pushing, pulling, climbing, crawling, stooping,

rotation, flexion, or extension.  *See id.* (noting that climbing, balancing, stooping,

kneeling, and crouching are not present in the description and reaching is

performed only occasionally).  In short, Plaintiff does not show any evidence that

the ALJ's failure to pose the question resulted in more than harmless error.

### e.    The ALJ Showed that Other Work Existed in Significant Numbers in the National Economy

Finally, Plaintiff's argument that the ALJ failed to prove that other work

exists in significant numbers in the national economy is not persuasive.   The

Social Security regulations provide that:

> Work exists in the national economy when there is a significant
> number of jobs (in one or more occupations) having requirements
> which you are able to meet with your physical or mental abilities and
> vocational qualifications. Isolated jobs that exist only in very limited
> numbers in relatively few locations outside of the region where you
> live are not considered "work which exists in the national economy".
> We will not deny you disability benefits on the basis of the existence
> of these kinds of jobs. If work that you can do does not exist in the
> national economy, we will determine that you are disabled. However,
> if work that you can do does exist in the national economy, we will
> determine that you are not disabled.

20 C.F.R. § 404.1566(b).  The Sixth Circuit explains that the decision as to

whether a significant number of jobs exist in the national economy "must be based

on a case-by-case basis and ultimately must be left to the trial judge's common

sense in weighing the statutory language as applied to a particular claimant's factual situation." *Born v. Sec'y of Health & Hum. Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *see also Tyler v. Comm'r of Soc. Sec.*, No. 13-10399, 2014 WL 1338795, at *12 (E.D. Mich. Apr. 3, 2014) (concluding that "1,500 jobs, standing alone, constitute a 'significant' number for purposes of a Step Five finding."). Here, the ALJ concluded that 12,000 jobs in Michigan and 600,000 jobs nationally represented a significant number of jobs, rendering Plaintiff not disabled. (R. at 27-28.) Plaintiff points to no evidence to indicate that this is not a significant number of jobs pursuant to the regulations. I do not see a basis for disturbing that finding.

## G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

34

72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: May 20, 2015                     s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on May 20, 2015, electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti
(313) 234-5200
